**Charles R. JAMES–BEY, Plaintiff,**

v.

**James FREEMAN, et al., Defendants.**

**C.A. No. 86–559.**

United States District Court,
District of Columbia.

June 18, 1986.

---

Charles R. James-Bey, pro se.

Charles A. Ailstock, D.C. Dept. of Corrections, Washington, D.C., for defendants.

## MEMORANDUM OPINION

THOMAS F. HOGAN, District Judge.

This civil rights case is before the Court on defendants' motion to dismiss or for summary judgment. Plaintiff, Charles James-Bey, was convicted in the District of Columbia of Armed Robbery and Rape While Armed. He was initially incarcerated at the Lorton Reformatory, a prison operated by the District of Columbia Department of Corrections. Following a general strike among the resident prison population in July, 1984, plaintiff was transferred to a federal designation. The Bureau of Prisons ultimately sent plaintiff to USP–Marion, Illinois, where he is presently incarcerated. Plaintiff instituted this action against several Lorton officials seeking injunctive relief and damages under 42 U.S.C. §§ 1983, 1985(3) and 1986 for alleged violations of his constitutional rights.[1] Plaintiff alleges that the defendants' failure to comply with regulations issued under the Lorton Regulations Approval Act of 1982, 28 D.C.Reg. 865 (1981), concerning the segregation of disciplinary hearing records, violated his due process rights under the fifth and fourteenth amendments. Plaintiff also alleges that his transfer to federal designation at Marion, Illinois violated his equal protection rights under the fifth and fourteenth amendments. He further contends that defendants conspired to violate his constitutional rights and the Lorton Regulations Approval Act.

---

1. The defendants in this action, who held their positions at the time of the alleged wrongful acts, are: (1) James Freeman, Assistant Director of the District of Columbia's Department of Corrections; (2) Charles Lindsay, Administrator of Lorton; (3) William Plant, Assistant Administrator of Lorton; and (4) Paul Krull, Chief Classification and Parole Officer at Lorton.

## Background

### A. Prisoner Designation and Transfer

All prisoners convicted in the District of Columbia, in federal or in local court, are committed to the Attorney General's custody, for designation to a place of confinement. D.C.Code § 24–425 (1981). The Attorney General may designate "any available, suitable, and appropriate institutions, whether maintained by the District of Columbia government, the federal government, or otherwise, or whether within or without the District of Columbia." *Id.* The Attorney General may also authorize the transfer of a prisoner from one institution to another, if in his judgment it will be in the prisoner's well-being, or if it will relieve overcrowding or other unhealthful prison conditions, or "for other reasons." *Id. See also* 18 U.S.C. § 4082(b).

Transfer of offenders from a District of Columbia Department of Corrections ("DCDC") institution to a Bureau of Prisons ("BOP") institution is governed by procedures set forth in D.C.D.C. Department Order No. 4810.1B. Def.Exh.C. In relevant part, Order No. 4810.1B provides that seven categories of sentenced D.C. Code offenders may be recommended for transfer to a BOP institution. DO No. 4810.-1B.7.b., Def.Exh.C. Included therein are offenders "who are severe management problems" and "[t]hose who are known escape risks." *Id.* Recommendations are submitted by Administrators to Assistant Directors, and must be accompanied by (1) D.C. Board of Parole recommendations; (2) pre-sentence report, if available; (3) a summary of all disciplinary reports; and (4) a current Progress Report, which must include the individual's "adjustment and activities at the institution, his/her conduct, outstanding detainers, all actions by the D.C. Board of Parole, and medical or psychological problems, if any." DO No. 4810.1B.7.c., Def.Exh.C. No provision is made for inmate participation or appeal in the designation and transfer process set forth in DO No. 4810.1B. Further, no criteria govern the Director's ultimate decision to approve the Administrator's recommendation.

### B. Lorton Regulation Approval Act

The Lorton Regulations Approval Act of 1982 (the "LRAA" or the "regulations") sets forth the guidelines and procedures governing discipline of inmates at the Lorton Correctional Complex. Chapter I establishes an internal "Code of Offenses," and delineates the administrative procedures to be followed when an inmate is charged with a violation thereof. *See* LRAA § 100.1. Chapter 2 governs the placement of inmates in administrative segregation and in protective custody. If an inmate is charged with an offense, he is entitled to a hearing and an appeal of any adverse decision. *See* LRAA §§ 108–113. The records of the proceedings must be either destroyed or separately maintained if the inmate is found not guilty, and may not be made available to any agency or individual outside the D.C.D.C. *See* LRAA § 114.2–114.3. The regulations do not address the maintenance of inmates' other records, nor do they address the mechanics of federal designation.

## Statement of Facts

Plaintiff alleges that defendants violated his constitutional rights by including records of unadjudicated internal offenses in documents sent to the BOP in connection with the request for federal designation and transfer. The undisputed facts regarding his designation and transfer are as follows:

On February 24, 1983 plaintiff was convicted of Armed Robbery and Rape While Armed, and was sentenced to a term of 32 to 96 years. He had been imprisoned previously, and admits that he "walked away" from the Minimum Security Facility in 1976, during an earlier incarceration. Plaintiff states that he was never prosecuted for the two other alleged escapes, in 1969 and 1981, which are reflected in his federal designation Progress Report. Def. Exh.B.

During July, 1984, while plaintiff was serving his present sentence at Lorton, the residents of the Maximum Security Facility went on a general strike. Prison officials viewed plaintiff as one of the major instigators of the strike, and accordingly prepared a Progress Report recommending that he be considered for a federal designation because "he poses a severe management problem to the D.C. Department of Corrections." Def.Exh.B. Plaintiff was not charged with an offense under the LRAA in connection with the strike, and therefore no hearings or other proceedings were held. On July 25, 1984 he was transferred to the federal prison in Lewisburg, PA, along with four other inmates named as central figures in the strike, to be held pending further designation. Pltf.Exh.B. Plaintiff was designated to Marion, IL, where he arrived on August 15, 1984. The Marion facility is the only level six prison in the country, and has been on continuous lock-down status since 1983.

### Discussion

■ Plaintiff contends that the defendants violated his due process and equal protection rights, guaranteed by the fifth and fourteenth amendments to the Constitution, by including information about unadjudicated offenses in his Progress Report, contrary to the LRAA record restrictions.[2]

#### A. Due Process

■ Plaintiff's due process claim is necessarily twofold: (1) that he has a protectible liberty interest in remaining at Lorton, within the D.C. Department of Corrections; and (2) that defendants deprived him of this interest by including in their recommendation for federal designation information

about his prior escapes and strike involvement in spite of the guarantees of the LRAA.[3]

The Due Process Clause alone does not protect against transfer of a prisoner to a particular penal institution, even if the confinement conditions at the new institution are substantially more severe. *Meachum v. Fano*, 427 U.S. 215, 223–25, 96 S.Ct. 2532, 2537–39, 49 L.Ed.2d 451 (1976); *Montanye v. Haymes*, 427 U.S. 236, 239, 96 S.Ct. 2543, 2545–46, 49 L.Ed.2d 466 (1976). This holds true even if the inmate is transferred to an institution in a different state. *Olim v. Wakinekona* 461 U.S. 238, 242, 245, 103 S.Ct. 1741, 1744, 1745, 75 L.Ed.2d 813 (1983) (transfer of prisoner from Hawaii to mainland does not implicate due process liberty interest). Thus, "[a]s long as the conditions or degree of confinement to which the prisoner is subjected is within the sentence imposed upon him and is not otherwise in violation of the Constitution, the Due Process Clause does not in itself subject an inmate's treatment by prison authorities to judicial oversight." *Montayne*, 427 U.S. at 242, 96 S.Ct. at 2547. Because incarceration at Marion, IL, a federal prison, is within plaintiffs' sentence, the Due Process Clause alone does not constrain his transfer there. He must look elsewhere for a protectible interest.

A state may create a protected liberty interest by enacting a statutory or regulatory framework which places substantive limitations on official discretion. *See Olim*, 461 U.S. at 249, 103 S.Ct. at 1747. In *Hewitt v. Helms*, 459 U.S. 460, 468, 103 S.Ct. 864, 869, 74 L.Ed.2d 675 (1983), the Supreme Court determined that state prison regulations created a protected liberty interest in the dispensation of administra-

---

**2.** The District of Columbia is not a "state" for purposes of the fourteenth amendment. *E.g., Osgood v. District of Columbia*, 567 F.Supp. 1026 (D.D.C.1983). Principles of equal protection, however, inhere in the fifth amendment's due process guarantee, which is applicable to the District of Columbia. *Id.* As a matter of technical pleading, to the extent plaintiff's claims rely upon fourteenth amendment rights, they must be dismissed.

**3.** Although plaintiff asserts a protectible property interest, the complaint herein, even when construed with the liberal eye given *pro se* prisoner pleadings, *e.g., Hughes v. Rowe*, 449 U.S. 5, 9, 10, 101 S.Ct. 173, 175, 176, 66 L.Ed.2d 163 (1980), does not set forth facts from which such an interest may be derived.

tive segregation within a prison. The regulations at issue in *Hewitt* established a procedural structure to regulate the use of administrative segregation, providing an inmate with notice and an opportunity for a hearing. *Id.* at 471 n. 6, 103 S.Ct. at 871 n. 6. The addition of specific substantive predicates upon which the decision to confine an inmate to administrative segregation was required to be based, was sufficient to create a protected liberty interest. *Id.* at 472, 103 S.Ct. at 871-72.

In *Olim*, the Court elaborated on the standard for finding a state-created liberty interest for prisoners. 461 U.S. at 249, 103 S.Ct. at 1747. The Court held that a liberty interest is not created where no substantive limits are placed on official decision-making, and stated that:

> An inmate must show "that particularized standards or criteria guide the State's decisionmakers." If the decisionmaker is not required to base its decisions on objective and defined criteria," but instead can deny the requested relief for any constitutionally permissible reason or for no reason at all," the State has not created a constitutionally protected liberty interest.

*Olim*, 461 U.S. at 249, 103 S.Ct. at 1747 (citations omitted). The Court in *Olim* found that the State regulations did not create a liberty interest because they contained no standards governing the ultimate decisionmaker's exercise of discretion in approving or denying the recommendation. *Id.* at 242–43, 103 S.Ct. at 1744. The regulations governing transfer of inmates from Lorton, although setting forth criteria for the initial transfer recommendation, do not place substantive limits on the ultimate decisionmaker's discretion in reviewing the recommendation: the Director is free to approve or reject Administrators' transfer recommendations, after review of materials submitted. Thus, under *Olim*, the State has created no Due Process liberty interest in continued incarceration at the Lorton facility. *Accord Curry-Bey v. Jackson*, 422 F.Supp. 926, 932 (D.D.C.1976) (Lorton prisoner has no justifiable expectation he won't be transferred).

Since plaintiff has no liberty interest to assert under the due process clause, the challenge he makes to the adequacy of the procedure which implemented his transfer (i.e., improper inclusion of records for BOP review) need not be considered. *E.g., Meachum*, 427 U.S. at 229 n. 8, 96 S.Ct. at 2540 n. 8 (presence of allegedly unfounded information in inmate's record need not be considered unless record is to be reviewed in the course of a decision to which due process guarantees attach). To the extent plaintiff's claims are based on his due process rights, they must be dismissed.

### B. *Equal Protection*

■ Although not well articulated, plaintiff's equal protection argument appears to be that equal protection is violated by the fact that Lorton inmates are provided procedural protections before receiving disciplinary punishment, but not before being transferred, when the alleged reason for transfer would have warranted issuance of a disciplinary charge. In addition, plaintiff may claim that his right to equal protection was violated because only he and five other inmates were transferred, even though the entire prison population participated in the strike. Absent issues concerning fundamental rights or suspect classifications, the treatment of an inmate as eligible for transfer rather than discipline will not violate the fifth amendment's guarantee of equal protection if it bears a rational relationship to a legitimate state interest. *See, e.g., Allgood v. Morris*, 724 F.2d 1098 (4th Cir.1984).

As noted above, plaintiff was recommended for transfer because of his involvement in the general strike, and because of his prior institutional history of escapes. This behavior was found to pose a threat to "staff, peers and the orderly operation of the institution." Def.Exh.B. Under D.O. No. 4810.1B, a prisoner may be transferred if he poses a severe management problem. The Court in *Hewitt* recognized that "[i]n the volatile atmosphere of a prison, an inmate easily may constitute an unacceptable

threat to the safety of other prisoners and guards even if he himself has committed no misconduct," and that mitigation of this threat is "perhaps the most fundamental responsibility of the prison administration." *Hewitt,* 459 U.S. at 473–74, 103 S.Ct. at 872–73. The Court finds that the provisions for transfer based on potentially severe management problems within the prison thus embody a legitimate state interest.

Nothing in the LRAA requires officials concerned with management problems to initiate disciplinary actions against an inmate; nor are officials required to transfer or discipline all inmates allegedly involved in the same incident. Rationality does not require precisely similar treatment of inmates. Any number of reasons may justify transfer, including overcrowding and the need to separate particular prisoners. *See Olim,* 461 U.S. at 246, 103 S.Ct. at 1746. Plaintiff alleges no facts to support a claim that his individual selection for transfer rather than discipline was arbitrary, unreasonable or irrational. The Supreme Court has noted that "[p]rison administrators ... should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell v. Wolfish,* 441 U.S. 520, 547, 99 S.Ct. 1861, 1878, 60 L.Ed.2d 447 (1979) (quoted in *Hewitt v. Helms,* 459 U.S. 460, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983)). Accordingly, the officials' exercise of their discretion in this matter must be upheld and plaintiff's equal protection claim under 42 U.S.C. § 1983 and § 1985(3) must be dismissed. *See also Curry-Bey,* 422 F.Supp. at 931 (transfer from Lorton does not violate equal protection). Since the Court has found that plaintiff's rights under 42 U.S.C. § 1985 were not violated, summary judgment must also be granted in defendants' favor on his claim under § 1986. *See* 42 U.S.C. § 1986.

An appropriate order incorporating the conclusions set forth above accompanies this opinion.